UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

SECURITIES AND EXCHANGE )
COMMISSION, )
    Plaintiff, )
v. ) Case No. 2:13-cv-2279
)
ARCHER-DANIELS-MIDLAND ) Equitable Relief is Sought
COMPANY, )
    Defendant. )

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendant Archer-Daniels-Midland Company ("ADM" or the "Company"):

## NATURE OF THE ACTION

1.    This matter involves violations of the books and records and internal controls provisions of the Foreign Corrupt Practices Act ("FCPA") by ADM. At certain times between 2002 and 2008, Alfred C. Toepfer, International G.m.b.H. ("ACTI Hamburg") and its affiliate, Alfred C. Toepfer, International (Ukraine) Ltd. ("ACTI Ukraine") paid approximately $22 million to two third-party vendors so that they could pass on nearly all of that money as bribes to Ukrainian government officials to obtain over $100 million in accumulated value added tax ("VAT") refunds. These payments were recorded by ACTI Hamburg and ACTI Ukraine in their books and records as insurance premiums and other business expenses. ADM indirectly owns a majority of ACTI Hamburg and ACTI Ukraine through its 80% interest in Alfred C. Toepfer International B.V. ("ACTI"), and in 2002, ADM began consolidating ACTI's financial results into its financial statements.

1

2.      In order to disguise the purpose of these improper payments, ACTI Hamburg and ACTI Ukraine made certain payments for export-related services and insurance premiums to third parties, but, in fact, nearly all of these payments were intended to be passed on through these third parties as bribes to Ukrainian government officials in exchange for obtaining VAT refunds for and on behalf of ACTI Ukraine.

3.      ACTI's conduct went unchecked by ADM, and ACTI continued to make these improper payments for several years.  ADM's anti-bribery compliance controls in existence at the time were insufficient in that they did not deter and detect these payments.  ACTI Hamburg and ACTI Ukraine created inaccurately described reserves in their books and records, manipulated commodities contracts that were kept open for an extended period of time, structured payments to avoid detection, and created fictitious insurance contracts to hide from ADM and others the payments to third-parties to secure VAT refunds in Ukraine.

4.      Due to the consolidation of ACTI's financial results, which included these inaccurately characterized payments, into ADM's books and records, ADM violated Section 13(b)(2)(A) of the Securities Exchange Act of 1934 ("Exchange Act").  ADM violated Section 13(b)(2)(B) of the Exchange Act by failing to maintain an adequate system of internal controls to detect and prevent the illicit payments.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u(d) and 78aa]. ADM has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

6. Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because ADM's headquarters are located in Decatur, Illinois.

## DEFENDANT

7. Archer-Daniels-Midland Company is a large agricultural processing company based in Decatur, Illinois. It is incorporated in Delaware. ADM's common stock is registered with the Commission pursuant to Section 12 of the Exchange Act and is traded on the New York Stock Exchange under the symbol "ADM."

## OTHER RELEVANT ENTITIES

8. Alfred C. Toepfer, International G.m.b.H. ("ACTI Hamburg") is a German limited liability company that is headquartered in Hamburg, Germany. The business of ACTI Hamburg, which operates thirty-six sales offices worldwide, specializes in agricultural commodities and processed products. ADM initially acquired an indirect interest in ACTI in 1983 and, by 2002, obtained an indirect 80% ownership interest in ACTI Hamburg.

9. Alfred C. Toepfer International (Ukraine) Ltd. ("ACTI Ukraine") is a wholly-owned subsidiary of ACTI, and an affiliate of ACTI Hamburg. It is headquartered in Kiev, Ukraine and has six branch offices in addition to a facility at the Port of Odessa.

## FACTUAL ALLEGATIONS

**Background**

10. ADM first acquired an interest in ACTI in 1983 and, by 2002, indirectly owned 80% of its stock. Beginning in 2002, ADM consolidated ACTI's financial results into ADM's financial statements. Accounting, tax, and sales personnel at ACTI reported to ACTI's management, not to personnel within the corresponding functions at ADM. ADM had only five representatives on ACTI's ten-person supervisory board during the relevant period, and ACTI's operations were largely independent from ADM's operations. In fact, at times, ADM and ACTI Hamburg traders competed against each other in bidding to fulfill grain contracts.

11. ACTI Hamburg sourced commodities in Ukraine through ACTI Ukraine in order to make sales to customers outside of the Ukraine. ACTI Hamburg used ACTI Ukraine to fill customer orders for agricultural commodities located in Ukraine. After ACTI Ukraine purchased the agricultural products within the Ukraine, it arranged for their export from the Port of Odessa on the Black Sea. ACTI Hamburg's trading desk in Hamburg arranged the sales on behalf of ACTI Ukraine. ADM did not implement controls that required pre-clearance or monitoring of ACTI Hamburg's relationship with third-party agents in the Ukraine or transactions involving the Ukraine government.

12. Ukraine imposed a 20% VAT on goods purchased in Ukraine. If the goods were exported, the exporter could apply for a refund of the VAT already paid to the government on those goods. At certain times from 2002 until 2010, however, the Ukrainian government

4

determined to delay paying the VAT refunds owed or did not make any refund payments at all. During these years, ACTI Ukraine accumulated large receivables for VAT refunds, including as high as approximately $46 million at certain periods.

13. At certain times during the relevant period, in order to obtain VAT refunds, ACTI Hamburg and ACTI Ukraine made improper payments, which were generally 18%-20% of the corresponding VAT refunds, to two third-party vendors so that they could pass on nearly all of the money to Ukrainian government officials with knowledge of and approval by ACTI Hamburg. ACTI Ukraine and ACTI Hamburg used these two third-party vendors to cover up bribes paid to Ukrainian government officials in exchange for those officials' assistance in helping ACTI Ukraine obtain VAT refunds. ACTI's books and records improperly recorded the payments as insurance premiums or other business expenses.

**ADM Executives Are Told Charitable Donations Are Made to Secure ACTI Ukraine's VAT Refunds**

14. In or around July 2002, executives from ACTI Hamburg traveled to ADM's headquarters in Decatur, Illinois for business meetings. In one of those meetings, these ACTI executives met with executives from ADM's tax department and discussed ACTI Ukraine's ability to recover VAT refunds and the way in which ACTI Ukraine was accounting for the write-down of those refunds. During this discussion, the ACTI Hamburg executives stated that the way in which ACTI Ukraine was recovering its VAT refunds was by making charitable donations.

15. On or about October 4, 2002, an ADM executive in the tax department sent an e-mail to the head of an international tax organization and stated, "One of our affiliates operates in the Ukraine. In order to recover 100% of their input VAT they have to pay 30% of the amount to local charities. The charitable amount is not deductible. Is this common practice in the

5

Ukraine?  Is this legal?  Is there any way to avoid having to pay the 30% in order to get the 100%?"

16.     On October 8, 2002, the ADM executive referenced in paragraph 15 above forwarded the e-mail referenced in paragraph 15 above to two other executives in ADM's tax department, and stated that he had spoken with the head of the international tax organization and that "the bottom line is that ACTI is getting screwed by someone…[T]he consensus is that there is no way legislation could require this situation.  It could very well be a local tax authority issue.  If ACTI would like we could have the [tax organization] address this issue with the local tax authorities as a policy matter and not a company specific issue.  They could raise the issue with some of the Tax Service headquarters people who the [tax organization] has had over to the US and with the Deputy Minister of Finance.  The [tax organization] could give ACTI a veil to hide behind as this issue is addressed with the authorities and, hopefully, results in a fix for ACTI.  Let me know what ACTI thinks about this."

17.     On or about October 24, 2002, one of the ADM executives who received the e-mail referenced in paragraph 16 above sent an e-mail to the other two executives on the e-mail referenced in paragraph 16 above, summarizing the follow-up meeting he had with executives from ACTI Hamburg.  In the e-mail, the ADM executive outlined six tax issues relating to ACTI entities that he discussed with ACTI Hamburg executives, including the VAT refunds for ACTI Ukraine, and stated, "[ACTI's] current procedure is to book the input VAT as a balance sheet receivable and write it down on average of 30% a year (depending on interest rates, devaluation, etc.)…According to [an executive at ACTI Hamburg] it is a fight every year [to get VAT refunds] but overall he thinks that Toepfer has good contacts with politicians and the authorities in the Ukraine.  I mentioned that [the ADM executive referenced in paragraph 16 above] had

some good contacts as well within business organizations operating in the Ukraine like the [the tax organization referenced in paragraph 16 above] which also might be helpful.  The issue here is that [the ACTI Hamburg executive] to[ld] me that the Toepfer's contacts usually ask for 'donations'.  I asked him how much were these 'donations' and he answered that they could be up to 20% of the VAT receivable.  My concern is that these 'donations' are not legal, not deductible, are Subpart F income and against ADM corporate compliance policy.  Additionally, I am not sure that the way they are booking this VAT receivable is US GAAP.  I am open to suggestions on how to proceed on this."  The Internal Revenue Code defines "Subpart F income" in the case of any controlled foreign corporation to include, among other things, the "amounts of any illegal bribes, kickbacks, or other payments . . . directly or indirectly to an official, employee, or agent in fact of a government . . . ," certain insurance income, foreign base company income, certain foreign source income, including that attributable to the earnings and profits of the foreign corporation, as well as certain income derived from any foreign country. 26 U.S.C. §952(a).  The Internal Revenue Code further specifies that the "payments referred to in paragraph (4) [of Subpart F] are payments which would be unlawful under the Foreign Corrupt Practices Act of 1977 . . . ." 26 U.S.C. §952(a).

       18.     In or around 2004, ADM established a joint venture in Ukraine between ADM and a Swiss company.  In connection with the creation of the joint venture, ADM retained an accounting firm to perform an analysis of tax issues that might arise.

       19.     On or about April 30, 2004, ADM's accounting firm sent a letter to two ADM executives, stating: "There are a number of structures aimed at facilitation of VAT refund that are widespread in Ukraine….Some of these structures bear legal risks and may be challenged by the tax authorities.  Moreover, structures normally envisage that the exporter obtains VAT refund

with a 30-40% discount. From the discussions during our meeting in Odessa we learned that [the Swiss joint venture company] currently implements various VAT optimization structures at its subsidiary and plans to have them implemented at the joint venture. Since these structures often lack transparency and sometimes have tax and legal risks attached, we believe there is a need to perform a more detailed analysis of their applicability at the joint venture."

20. Given ADM's insufficient anti-bribery compliance policies and procedures at the time, it did not prevent or detect the improper payments made by ACTI Ukraine or ACTI Hamburg.

**ACTI's Improper Payments through a Shipping Company Vendor**

21. At certain times between 2002 and 2008, ACTI Ukraine and ACTI Hamburg made payments to a stevedoring company in the port of Odessa (the "Shipping Company") so that it could pass on nearly all of those payments to Ukrainian officials in order to obtain VAT refunds on behalf of ACTI Ukraine. Senior managers at ACTI Ukraine conspired with the owner of the Shipping Company to artificially inflate invoices. The amount by which the invoices between the Shipping Company and ACTI Hamburg were inflated represented a sum that was available for the Shipping Company to pass to Ukraine government officials.

22. When ACTI Hamburg received the invoice from the Shipping Company, it withheld payment of a portion of the amount in the invoice, and then upon receiving the relevant VAT refund, ACTI Hamburg released the funds to the Shipping Company.

23. Certain executives at ACTI Hamburg were aware that the payments to and arrangement with the Shipping Company were improper. In April 2002, an employee of ACTI Hamburg cautioned his colleagues not to look too deeply into the Shipping Company: "For

8

reasons that you know (if you don't know them, I will explain them to you verbally), we will have to continue to make payments" to the Shipping Company.

24.     In April 2005, the ACTI Ukraine general manager reported to senior ACTI Hamburg officers that VAT claims had been aggregated in the escrow account used to pay the Shipping Company.  He also reported that part of the purpose of the escrow account was to avoid scrutiny of the overpayments by ADM internal auditors and the ACTI Hamburg shareholders.

25.     By the end of 2006, the receivable for Ukrainian VAT on ACTI Ukraine's books had grown to approximately $40 million.  In a report dated December 29, 2006, ACTI Hamburg's Chairman wrote that "the situation in Ukraine has again returned to what we found several years ago," and that companies would once again have to bid for VAT refunds, a process he described as a "bidding orgy."

26.     Between January and March 2007, ACTI Hamburg paid the Shipping Company $8,236,269 in order to obtain VAT refunds totaling $46,366,107.  The refunds generally arrived within a day or two of the payments to the Shipping Company.  ACTI Hamburg disguised these payments on its books and records as prepayments for feed barley.

**ACTI Maintains Inaccurate Entries on its Books Related to VAT Recovery**

27.     In January 2007, the size of the VAT receivable had risen to approximately $40 million dollars.  The 20% reserve for this receivable drew the attention of ADM's European finance and controlling department.  The department questioned ACTI on the basis for setting aside such a large reserve.

28.     After ACTI Ukraine received a VAT refund on or about January 23, 2007, an ADM controller asked an executive at ACTI Hamburg what the basis of the VAT refund was.  In response, an ADM executive relayed from an executive at ACTI Hamburg that "this [VAT

refund] is from 2005 . . . but the collection came with a price, the price being the government required a 'depreciation' (as [the ACTI Hamburg Vice Chairman] called it) of 18%.....basically, the companies owed the money from the government had to write off 18% to collect this amount. He is hopeful there is no more 'depreciation' but he does not have a clear picture as to when the payment might be received or how the govt will settle the balance. [T]he amount received will not go towards the P&L as it is simply reducing the receivable and the amount written off appears to be lost to the govt."

29. Based on this exchange with ACTI Hamburg, ADM understood that ACTI Ukraine expected to obtain VAT refunds resulting from negotiating a legal settlement with the Ukrainian government, which would cause the receivable and corresponding reserve to decrease. ACTI Hamburg, in efforts to avert ADM's concerns regarding the size of the receivable, advised that ACTI Ukraine, as part of the settlement, agreed to waive 18% of its VAT receivable. ACTI Hamburg, however, never disclosed that the 18% figure represented approximately the amount of improper payment provided to third-party vendors so that nearly all of those monies could be provided to Ukrainian government officials.

**ACTI Ukraine Makes Payments to a Third-Party by Using Fake Insurance Premiums**

30. Between February 2007 and August 2008, the ACTI Ukraine general manager organized a scheme through which ACTI Ukraine used a Ukrainian insurance company (the "Insurance Company") to funnel improper payments to Ukrainian government officials. ACTI Ukraine arranged for the Insurance Company to falsely bill it for crop insurance, which the Insurance Company never intended to honor, adjusting the premiums to be roughly 20% of the VAT refund. ACTI Ukraine improperly recorded the payments as insurance premiums in its books and records.

31. The improper payments through phony insurance contracts were made with the knowledge and approval of senior officials at ACTI Hamburg. In February 2008, ACTI Hamburg's Vice Chairman reported to ACTI's Chairman that the ACTI Ukraine general manager "just got an offer from someone to set up VAT refunds at a price 3% lower than the current arrangement. . . . insurance money will now be used for VAT refunds."

32. In addition, senior ACTI officials knew the insurance arrangement was not legitimate, as evidenced by e-mail communications between the ACTI Ukraine CFO and ACTI Hamburg senior managers, stating: "The contracts completed here, either sporadically or ad hoc, include no kind of insurance protection, but serve the purpose only of generating a commission for the VAT repayment in this manner. Regardless of the wording of the contract, the content is completely different. That means that in case of conflict, claims could not be made successfully."

33. In all, ACTI Ukraine paid approximately $9 million through the Insurance Company for refunds totaling $44 million, which were received between March 29, 2007 and August 1, 2008. ACTI Ukraine misrepresented these payments as insurance premiums in its books and records.

**ADM's Discovery and Subsequent Remedial Measures**

34. In mid-2008, after becoming aware of these insurance expenses, ADM controllers questioned ACTI executives regarding these expenses, particularly the basis for the accounting treatment of these expenses. An ACTI Ukraine employee disclosed to its outside auditors that the insurance payments were, in fact, made to secure VAT refunds. After ADM controllers received this information, ADM's legal and compliance departments took action, which led to an

immediate investigation in which ADM ultimately uncovered ACTI's various schemes to secure VAT refunds.

35.     Following discovery of these payments, ADM immediately retained outside counsel to conduct an internal investigation.  As a result of the investigation, using its authority as majority shareholder through the ACTI supervisory board, ADM terminated certain ACTI executives.  ADM then voluntarily conducted a world-wide risk assessment and corresponding global internal investigation, made numerous presentations to the Department of Justice and Securities and Exchange Commission, made current and former employees available for interviews, produced documents without subpoena, and implemented early and extensive remedial measures.

**ADM's Violations**

36.     ACTI Hamburg and ACTI Ukraine characterized their improper payments to the Shipping Company and the Insurance Company as insurance premiums and other business expenses even though nearly all of those payments were intended to be used for payment to Ukrainian government officials.  Due to the consolidation of ACTI's financial results into ADM's, ADM's financial records also failed to reflect the true nature of the payments.

37.     Between 2002 and 2008, ADM's anti-corruption policies and procedures relating to ACTI were decentralized and did not prevent improper payments by ACTI to third-party vendors in the Ukraine or ensure that these transactions were properly recorded by ACTI.  In this respect, ADM failed to implement sufficient anti-bribery compliance policies and procedures, including oversight of third-party vendor transactions, to prevent these payments at ACTI Hamburg and ACTI Ukraine.

38. Through its various schemes, ACTI Ukraine and ACTI Hamburg paid roughly $22 million in improper payments to obtain more than $100 million in VAT refunds earlier than they otherwise would have. Getting these VAT refunds earlier—before the Ukraine endured a brief period of hyperinflation—gave ACTI Ukraine a business advantage resulting in a benefit to ADM of roughly $33 million.

## FIRST CLAIM FOR RELIEF

**Violation of Exchange Act Section 13(b)(2)(A)**
**[15 U.S.C. §78m(b)(2)(A)]**

39. The Commission re-alleges and incorporates by reference paragraphs 1 through 38.

40. As described above, ADM through its subsidiary, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and disposition of its assets.

41. By reason of the foregoing, ADM violated, and unless enjoined will continue to violate, Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

## SECOND CLAIM FOR RELIEF

**Violation of Exchange Act Section 13(b)(2)(B)**
**[15 U.S.C. §78m(b)(2)(B)]**

42. The Commission re-alleges and incorporates by reference paragraphs 1 through 41.

43. As described above, ADM failed to devise and maintain a system of internal controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary (I) to permit preparation of financial statements in conformity with

generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for its assets.

44. By reason of the foregoing, ADM violated, and unless enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

A. Permanently restraining and enjoining ADM from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(A), and 78m(b)(2)(B)];

B. Ordering ADM to disgorge ill-gotten gains wrongfully obtained as a result of its illegal conduct, with prejudgment interest; and

C. Granting such further relief as the Court may deem just and appropriate.

Dated December 20, 2013

Of Counsel:
Gerald W. Hodgkins
Anita B. Bandy

Respectfully submitted,

s/ Nicholas A. Brady
Nicholas A. Brady (D.C. Bar No. 484612)
Lead Counsel
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Tel: (202) 551-4732
Fax: (202) 772-9238
bradyn@sec.gov

Timothy Leiman (Illinois Bar No. 6270153)
Securities and Exchange Commission
Chicago Regional Office
175 W. Jackson Blvd. Suite 900
Chicago, IL 60604
Tel: (312) 353-5213
leimant@sec.gov

Attorneys for Plaintiff